DAVID W. RIZK - CABN # 284376
2261 Market Street, Suite 5947
San Francisco, CA 94114
Telephone:  (415) 517-9044
Email:       david@dwr-firm.com

Counsel for Defendant RELEFORD

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | Case No.: CR 22-075 WHO |
|---|---|
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE** |
| v. | |
| ALLEN RELEFORD, | |
| Defendant. | |

**I.     INTRODUCTION**

Defendant Allen Releford will be before the Court for sentencing in this felon-in-possession case. Mr. Releford has benefited enormously from judicial supervision since the Court elected to release him on stringent conditions him over the government's objection almost two years ago. This foregoing period is the only portion of Mr. Releford's life as an adult spent out of custody and living with his family in the community since he was sentenced to 14 years of state custody at age 16. That is worth reiterating: Mr. Releford spent half of his life in custody. Against that backdrop, what happened next was remarkable. He found employment and has been working ever since, living with his mother and taking care of her as she continues to recover from multiple surgeries that removed a brain tumor. Notably, Mr. Releford is her only available immediate support.

Mr. Releford still has work ahead of him. He is currently searching for a new job since the position he currently holds as a security guard offers unreliable shifts. He would like to move out of

San Francisco entirely but does not yet have the savings or credit score to qualify for an apartment in the Bay Area. In the long term, he wants to enroll in college and finish the academic work he began in prison to pursue a bachelor's degree in communications, and then, find a career befitting of his intellectual talents that will support him and a family. To achieve this, however, he will need the Court's ongoing support and resources. Overall, however, Mr. Releford has made good on the promise that the Court recognized in him when deciding to grant him bail. It is a remarkable turnaround for a person who was a teen gang member and convicted of participating in a horrible kidnapping and rape of another minor.

Any custodial sentence for Mr. Releford would be deeply counterproductive. Federal prison would threaten to undo all of the work that Mr. Releford, U.S. Pretrial Services, and the Court (including Judge Beeler) has undertaken to rehabilitate Mr. Releford and assist him in transitioning out of a custodial institution. For all these reasons, Mr. Releford respectfully requests a sentence of time served, followed by three years of supervised release.

## II.  BACKGROUND

Mr. Releford has lived in the Bay Area virtually all of his life out of custody. He was born in San Francisco thirty-two years ago to Tiffany Porche and Allen Releford. Presentence Report (PSR) ¶ 38. He is the oldest of five siblings: he has two younger sisters and two younger brothers. *Id.* Although Mr. Releford's father has been largely absent in his life, Mr. Releford has remained close with the rest of his family, including his mother, his brothers, his sisters, his grandmother, and his godmother. *Id.* With the exception of one younger sister, who resides in Vallejo, California, everyone else in his family resides in San Francisco. *Id.*

[redacted] ECF No. 34-2 (underseal psychological assessment report) at 2. His mother was deemed unable to care for him, and Mr. Releford had to move to Louisiana for the first four years of life, where he lived under the care of his grandmother. *Id.* at 2. Eventually he returned to his mother's care in San Francisco, where he has lived since. *Id.* [redacted]

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ During this time, Mr. Releford's father was largely absent as he was in and out of jail and prison. *Id.*

Perhaps a reflection of his smarts, Mr. Releford found refuge at school. He attended Edison Elementary School and Herbert Hoover Middle School. He enjoyed learning, particularly in science class. In elementary school, he frequently attended after-school programs to do his homework. In middle school, he found his passion for sports, and he spent much of his free time playing football, basketball, and baseball. *Id.* at 3. He and his team excelled, and they received numerous trophies.

Unfortunately, life was much harder off campus. Mr. Releford was small in stature as a child, and he was subjected to teasing and harassment as a result. *Id*. at 2. As he got holder, he was also exposed to extreme violence. He witnessed friends being shot when he was only fifteen years old. *Id.* at 4. At age 16, he lost his best friend to gun violence. The lack of parental supervision, along with his early exposure to bullying and violence, left Mr. Releford vulnerable to the influences of older kids involved in street gangs – the same kids who had harassed him when he was younger. *Id.* at 3. As his child psychologist observed, Mr. Releford was likely seeking a relationship with older males to protect him and provide him in lieu of his father. *Id.* at 13. Unfortunately, Mr. Releford sought acceptance by joining a gang, skipping school, and abandoning afterschool sports. He failed almost every class in high school and eventually was placed under juvenile wardship. *Id.* at 3.

In foster care, Mr. Releford was finally given the additional support and structure he needed. In a new environment, Mr. Releford transformed himself from an F-student to an A-student. Mr. Releford's high school transcript starkly reveals this transformation. In ninth grade, for example, he failed every class except two. *See* ECF No. 34-3. The following year in foster care, Mr. Releford earned As and Bs in every single class, with a resulting GPA of 3.50. *Id.* Mr. Releford's grades got better with each passing semester. In eleventh grade, Mr. Releford received an A in *every single class* except math (in which he got a B). *Id.*

Mr. Releford's English teacher in juvenile hall was so impressed with Mr. Releford that she wrote a letter of support for him in connection with his previous case. ECF No. 34-4. She described Mr. Releford as a "rare" student who "[took] advantage of every learning opportunity and applie[d]

himself to each and every assignment with one hundred percent of his capacity." *Id*. She further noted that when Mr. Releford wrote assigned essays, he did so with passion. *Id.* She also described a play that he wrote as "profound and well-written, and [making] a moving statement about violence." *Id.* She concluded that Mr. Releford was one of the best students she had in her classes and that she would not hesitate to give him her highest recommendations. *Id.*

Although Mr. Releford was making great strides in the classroom, he was still spending time on the street after school. At this time Mr. Releford's mother moved to Oakland and he fell into even deeper trouble. ECF No. 34-2 at 4. When he was just 16 years old, Mr. Releford was intoxicated and hanging out with three older men[1] when he became involved in a gruesome incident. All four were charged with kidnapping and raping a female victim. It was a very serious offense, and it was prosecuted accordingly. Mr. Releford was prosecuted as an adult. He and his three co-defendants all pled guilty to the same charges and received the same sentence: 14 years in custody. PSR ¶ 29. Not surprisingly, state prison was a horrible place for a teenager still growing up. He was surrounded by violence as well as drugs. Mr. Releford nonetheless tried to use the time to improve his circumstances and found success in school. He obtained his GED and took enough college-level courses to make substantial progress toward earning his bachelor's degree in communications. He also attended various self-help programming, including Alcoholics Anonymous, Coping Skills IV, Coping Skills Group Therapy, 12-week Epictetus course, 12-week Houses of Healing course, and multiple Life-Cycle Programs. ECF No. 34-5 (GED and programming certificates). He eventually opted into a special unit for "drop-outs" and other vulnerable inmates to steer clear of trouble.

Mr. Releford was released from state prison on September 6, 2021, to his mother's apartment in San Francisco. Having spent the past 14 years of his life (from age 17 to 31) in state prison, Mr. Releford did what he could to transition successfully into the community. Within a few months, Mr.

---

[1] Mr. Releford was the youngest person in the group and the only minor. In contrast, two co-defendants were age 24 and one was 21 years old at the time. As a treating psychologist later observed, it is very likely that Mr. Releford, as the youngest person in the group by far, was influenced to some degree by the older men. ECF No. 34-2 at 6, 8. In fact, Mr. Releford acknowledged after the incident that the co-defendants were intoxicated at the time, trying to coerce him to commit the offense, and that he was fearful of the co-defendants. *Id.* at 8.

Releford found a job at Mission Neighborhood Centers, where he worked full time as an Environmental Service Worker as part of the Tenderloin Clean Initiative. ECF No. 34-6. When he was not working at Mission Neighborhood Centers, Mr. Releford was often with his family helping them with their chores or volunteering at community events. ECF No. 34-7. He also spent time taking care of his mother in the early stages of her recovery from surgery. At the time, she had difficulty speaking, moving, and eating, and Mr. Releford helped with her daily activities and household chores. He also attended to his grandmother, who is in her seventies and uses a wheelchair.

When Mr. Releford was arrested during a parole search and then charged federally, he lost his job at the Mission Neighborhood Centers, but his supervisor attended his detention hearing and wrote to the Court to support his release to offer him fulltime employment. ECF No. 34-6. Unfortunately, the Centers' contract with the city expired the day after Mr. Releford's eventual release so he was unable to return to his prior employment. Instead, he searched for and eventually found employment with Urban Alchemy, where he worked fulltime for four to five months. PSR ¶ 50. He was eventually released from the halfway house to live at home with his mother on electronic monitoring.

In October 2022, Mr. Releford's forward progress hit a stumbling block when he was stopped by Gang Task Force officers with his girlfriend in her car. They searched the car and found a firearm hidden under the driver's seat. The body worn camera shows Mr. Releford visibly shocked and upset that there was a gun in the car and his girlfriend explained that she possessed it because she drove for Lyft and had a bad experience with a passenger. In a voluntary post-arrest interview, Mr. Releford swore he was not aware of its presence in the car and his girlfriend confirmed as much. The DNA analysis eventually corroborated their statements, as did photographic evidence from the search.[2] Nevertheless, he was charged and spent approximately four months in custody before the case was dismissed and he was released from custody with an admonishment from Judge Beeler that he had inadvertently placed himself in danger. PSR ¶ 5. To reassure the Court, Mr. Releford stipulated to a

---

[2] The photographs show that it was fully concealed lying underneath the driver's seat that was occupied Mr. Releford's girlfriend. The DNA report reflected "strong support" for DNA from Mr. Releford's girlfriend, and "limited support" for Mr. Releford himself. Obviously, the limited support result is accountable for: he has physical contact with his girlfriend and the interior surfaces of her car.

DEFENDANT'S SENTENCING MEMORANDUM
*RELEFORD*, CR 22–075 WHO

5

stay-away order from the area in the Dogpatch neighborhood where he had been arrested since law enforcement characterized it as a "gang zone."

Mr. Releford was released on electronic monitoring and searched for work again and found a position as a security guard for OnWatch, employment he holds to this day. Initially, Mr. Releford also took on employment as a clerk at St. Anthony's Foundation in the Tenderloin, but two full time jobs turned out to be too exhausting to sustain. He was reporting to St. Anthony's for a shift from 4 a.m. to 2 p.m., and then worked as a security guard during nights. After several months, he recognized that his obligations were unsustainable. It was a lesson for Mr. Releford, simply reflecting that he was still adjusting to the responsibilities of life in the community, outside of the prison institutions where he grew up. Today, Mr. Releford continues to work as a security guard but, as noted above, is applying for other jobs because the shifts are unreliable and increasingly sparse since retail conditions have deteriorated in San Francisco and drug store chains have closed.

Mr. Releford continues to spend most of his free time with his family, especially his mother. She unfortunately continues to suffer pain and swelling and other sequelae from her brain tumor and is assessing with her doctor the need for a third surgery in the future as her condition has worsened. Mr. Releford helps her with daily tasks and household chores and accompanies her on all of her excursions out of their apartment. This year, he obtained his driver's license for the first time in his life and purchased a car so that he can take her to the grocery store and doctor's appointments. PSR ¶ 44. (Previously, he was wholly dependent on his girlfriend for rides.) He also continues to spend time attending to his grandmother, who recently turned 71 years old and is also disabled.

When he was released from custody, taking care of his mother fell to Mr. Releford because he is the only one of his five siblings who is unmarried and without children—another consequence of his incarceration from age 17 to 31. Although Mr. Releford is upbeat about it, he recognizes that a family is something he is missing. He therefore particularly enjoys spending time with his nieces and nephews: "I've been gone so long, I've been trying to spend time with them and get a relationship with my nieces and nephews," he recently explained to defense counsel. Mr. Releford's sister's husband was murdered while Mr. Releford was in state custody, and so he and his other siblings make a special effort to assist in parenting her children. Every week Mr. Releford takes his sister's

high school son to the gym to play basketball since he is on the high school team; he also spends time regularly with her younger child.

Back when the Court was considering his bail application, Mr. Releford's parole officer reported that Mr. Releford was accountable and successful. *See* ECF No. 35 ¶¶ 3-4. That continued: Mr. Releford was successfully discharged from state parole last year. His performance on pretrial release has been a bit like his report card—just short of perfect. Last summer, he had some alerts on electronic monitoring that he believed were false positives and was subsequently admonished by the Court for turning up late to some counseling sessions. Most recently, a week ago, he admitted to Officer Broussard that he had consumed some alcohol and marijuana at a family function for his grandmother's 71st birthday (March 12, 2024). Other family members and friends were partaking, and Mr. Releford let down his guard and joined. They went out to a restaurant and were home by 11 p.m. Before taking a random drug test a couple days later, Mr. Releford candidly told Ms. Broussard what had happened and his drug test came back positive for marijuana.[3] Thankfully, Mr. Releford does not have any history of recent substance use or addiction and he has never previously had a positive test for any drug ever on pretrial supervision. PSR ¶ 48. He regrets his mistake and, if the Court inquires, he plans to assure it will not happen again because he is firmly in control and sober. One positive drug test over the course of a couple years is hardly cause to incarcerate Mr. Releford. Other than these relatively minor incidents, Mr. Releford has complied with all of his conditions of release for nearly two years now.

### III.   PRESENTENCE REPORT & GUIDELINES CALCULATION

The defense agrees with the Guideline calculation and has no outstanding objections to the PSR. However, as set forth below, he certainly does not agree with U.S. Probation and the government that a mid-Guidelines sentence of 33 months is appropriate in this case.

### IV.   ARGUMENT

---

[3] To the extent Ms. Broussard communicated to the Court that Mr. Releford had said he had gone to a different party "weeks ago" and consumed other unknown drugs, there appears to have been a misunderstanding because that is not true. Mr. Releford has never tested positive for any other drug. And, Mr. Releford's family would confirm in sworn testimony that he has not been out late at any party other than his grandmother's 71st birthday. Defense counsel has reached out to Ms. Broussard for clarification.

DEFENDANT'S SENTENCING MEMORANDUM
*RELEFORD*, CR 22–075 WHO

Courts have an overarching obligation to impose sentences that are sufficient but not greater than necessary to achieve the goals of § 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Although they provide a starting point and should be respectfully considered, the Guidelines are not mandatory and should not be accorded more weight than the other section 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). Importantly, not only are the guidelines not mandatory, "they are also not to be presumed reasonable." *Nelson v. Arizona*, 555 U.S. 350, 352 (2009) (emphasis added); *see also Rita v. United States*, 551 U.S. 338, 350-51 (2007). Instead, the Court must consider the Guidelines range, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(1), (a)(4) and (a)(6). In crafting a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a), the Court must also consider the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

Several matters warrant the Court's consideration in connection with the § 3553(a) factors and Mr. Releford's request for a sentence of time served followed by three years of supervised release:

*First*, as to the circumstances of the offense and Mr. Releford's personal history, neither suggests a custodial sentence must be imposed. Mr. Releford made a major error when he armed himself, feeling unsafe as a drop-out gang member who had recently reentered his community for the first time since he was a minor. Thankfully, this is a simple possession case where there was no discharge, no brandishing, and certainly no use of the firearm in connection with any other crime. Although he panicked when he was swarmed by police and tried to run for about 10 seconds, after his arrest, he apologized and immediately acknowledged his guilt. PSR ¶ 11. In the run of felon-in-possession cases, it is among the less nefarious offenses routinely before the Court, but still quite unsafe. That said, possession without any serious aggravating factors should not disqualify Mr.

Releford from receiving a non-custodial sentence, especially given his unique personal circumstances and the yearslong commitment he has shown to rehabilitating himself for the first time in his thirties.

Mr. Releford's personal history is unusual. It is relatively rare to come across a defendant who served *such* a long sentence starting at such a young age. Frankly, he survived and finally completed that sentence in remarkably good shape. Nevertheless, we knew at the inception of this case and argued to the Court in connection with Mr. Releford's bail application, that it would take him time to readjust to life in the community. The defense contended that the offense conduct was a red flag signaling primarily that he needed additional supervision and help, but that such assistance would be embraced by Mr. Releford given all of the other green flags (employment, sobriety, family connections, "drop-out" status, etc.). That has proven true. Two years later he is still employed, going to therapy, spending time with his family, and saving for the future. As the Court knows, obtaining his driver's license and car for the first time is a major step toward adulthood and independence and important to supporting his mother. Mr. Releford also deserves recognition for his realization that he needed a change of environment and to avoid areas that felt unsafe. He is still hoping to move out of the city to a suburb on the peninsula, but that may take a little more time given his mother's condition and the difficulty of finding affordable housing in the Bay Area. A term of supervision will provide Mr. Releford the tools he needs to continue advancing toward self-sufficiency.

His mother's medical condition also strongly counsels in favor of a non-custodial sentence. Mr. Releford is her primary support and caregiver and, without him living with her, the Releford family would struggle significantly. Concededly, she has other children in the area, but all of them have a family, children, and responsibilities of their own, and none of them are present for her like Mr. Releford is, night and day. If she undergoes another surgery, as appears increasingly likely, his proximity and daily assistance will be even more desperately needed. His connection to his grandmother and his nieces and nephews are to the same effect: they strongly support a sentence of continued supervision.

*Second,* just punishment, deterrence, and public safety, do not warrant a custodial sentence. As an initial matter, Mr. Releford now presents no threat to public safety. There was clearly a time many years ago when Mr. Releford was a major threat, but that was almost twenty years ago now when he

was a minor. The government largely overlooks this predominant fact when rehashing the prior case and arguing that it is reason for concern. As to punishment, a custodial sentence would be an *extremely* harsh punishment for somebody who has largely successfully adjusted to living in the community, against all odds. It would take him from his mother and the rest of his family after he has already suffered the loss of so much time with them, not to mention the remainder of his youth and young adulthood. Thus, while it is certainly true that most violations of § 922(a)(1) charged in federal court do merit a prison or jail sentence, that would not be a just outcome for Mr. Releford given the facts of this case at this stage in his life. Continuing instead on the current path toward rehabilitation is certainly the wiser option. Regarding deterrence, the most recent evidence from the Sentencing Commission shows that there is no deterrent effect from federal sentences imposed that are less than 60 months; a longer or shorter sentence under that threshold has no statistical impact on the likelihood of recidivism.[4] Accordingly, there is no empirical basis to believe that the 33-month sentence recommended in this case by the other parties is likely to have a deterrent impact on Mr. Releford. Of course, any effort to promote specific deterrence with incarceration would also be unnecessary and excessive because he has already demonstrated that he is amply deterred. More likely here, a custodial sentence would increase the risk of recidivism, given the likelihood that it would set Mr. Releford back and severely demoralize him.

*Third*, and finally, as to educational, vocational, medical, or other correctional treatment, supervision is absolutely appropriate in this case and better suited to provide what Mr. Releford needs than a custodial sentence. It is worth stating outright that prison would be counterproductive and downright harmful to Mr. Releford. He has already spent nearly half his life in prison and, to his credit, he took full advantage of the available programming and completed his high school degree and some college coursework while he was incarcerated. Rather than being incapacitated, Mr. Releford needs continued guidance from this Court and U.S. Probation. He should continue to see a

---

[4] U.S. Sentencing Commission, *Length of Incarceration and Recidivism*, June 2022 at 4 ("For federal offenders sentenced to 60 months or less incarceration, the Commission did not find any statistically significant differences in recidivism."), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220621_Recidivsm-SentLength.pdf (last accessed Mar. 21, 2024).

DEFENDANT'S SENTENCING MEMORANDUM
*RELEFORD*, CR 22–075 WHO

counselor, pass drug tests, search for better employment, and support his mother while saving for the future. Lastly, the prospect that Mr. Releford could, with the help of U.S. Probation and the Court, return to college to finish his degree and improve his earning potential, is to say the least very promising and exciting. Mr. Releford was once an excellent student, his mother described him to the probation officer as "ambitious," and he has still has much to accomplish in his life. He looks forward to discussing what comes next for him with the Court at sentencing.

## V.    CONCLUSION

For all the reasons set forth above, Mr. Releford respectfully asks the Court to sentence him to time served, followed by three years of supervised release.

Dated:    March 21, 2024                             Respectfully submitted,

                                                                              /S
                                                                     DAVID W. RIZK
                                                                     Counsel to Defendant